# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

CINCO RIOS, LLC,

        Plaintiff,

    v.                          **Case No. 22-CV-563**

CONCURRENCY, INC.,

        Defendant.

---

## DECISION AND ORDER

---

Plaintiff Cinco Rios, LLC brings this action against defendant Concurrency, Inc., claiming breach of contract. (*See* ECF Nos. 1, 22.) This matter comes before the court on Concurrency's motion for summary judgment. (ECF No. 23.) The matter is fully briefed and ready for resolution. The parties have consented to the jurisdiction of a magistrate judge. (ECF Nos. 4, 9.)

### 1. Background

Cinco Rios, LLC, d/b/a Blue Ribbon Puppy ("BRP"), is a Nevada limited liability company that sells and distributes pets and other animals to vendors throughout the United States. (ECF No. 30, ¶¶ 3-4.) Concurrency is a Wisconsin technology and development corporation. (*Id.*, ¶¶ 1-2.)

BRP had been experiencing issues with its business platform software, Dog on Web ("DOW"), and was looking to replace it. (ECF No. 35, ¶¶ 5, 9.) On April 24, 2019, BRP and Concurrency entered into a fixed-bid agreement ("the Agreement") in which Concurrency agreed to develop a web portal application to allow BRP to sell and distribute pets. (ECF No. 30, ¶ 5.) The Agreement consisted of a Statement of Work called "Blue Ribbon Puppy Development Project Milestone 2-4" ("SOW"). (*Id.*, ¶ 6.) The Agreement also included Appendix A (Change Management Process); Appendix B (Partner of Record); Appendix C (Scope Items); and Appendix D (Core Entity Relationships). (*Id.*, ¶ 7; ECF No. 1-1 at 14-29.)

Relevant to the parties' dispute is Appendix C, which provided an itemized list of 40 functional requirements, "the required functions of the software Concurrency was to develop." (ECF No. 35, ¶ 34.) These functional requirements were developed in collaboration between Concurrency and BRP's project team, consisting of BRP's CEO, Steve Rook, and Kurt Drier and Steve Czarnecky, neither of whom were employed by BRP but who served as technical advisors on the project. (*Id.*, ¶¶ 23, 35.) Drier is an IT executive with more than 32 years of experience in project management and software development, and Czarnecky previously worked for Concurrency as a consultant. (*Id.*, ¶¶ 21, 22, 24.)

Milestone 2 was the build phase of the web application. (ECF No. 30, ¶ 15.) Milestone 2 followed a "sprint-driven process" in which Concurrency would work

according to arranged release plans and development targets. (*Id.*) Milestone 3 ensured that the web application worked within the functional requirements and provided features that met BRP's expectations. (*Id.*, ¶ 16.) Milestone 4 was the phase in which the web application was to be deployed into production. (*Id.*, ¶ 17.) The Agreement called for "[b]i-weekly sprint review sessions for the project team to conduct a demo of what has been built to date." (ECF Nos. 35, ¶ 39; 1-1 at 8.)

Rook, Drier, and Czarnecky all participated in various sprint review sessions to go over work that had been completed and discuss what work was to be done next. (ECF No. 35, ¶¶ 31, 44.) BRP maintains that it repeatedly expressed concern during the sprint review sessions that Concurrency was not meeting its obligations under the Agreement. (*Id.*, ¶ 45.)

In October 2019 Drier sent Concurrency a document titled, "Definition of Done." (ECF No. 35, ¶ 50.) BRP maintains that the document outlined deficiencies in the software as it then existed. (*Id.*) Concurrency maintains that the document reflects Concurrency's position that most of the functional requirements were completed as of October 2019. (*Id.*)

By late 2019, due to disagreement between the parties regarding what work was included in the Agreement, the parties began to draft various change orders to the Agreement. (ECF No. 35, ¶ 51.) BRP received three change orders from Concurrency between December 2019. (*Id.*, ¶ 52; ECF No. 26, ¶ 6.) According to Concurrency, Change

Order 1 would be completed at no charge, while Change Orders 2 and 3 would be completed on a time and materials billing basis. (ECF No. 24 at 4 (citing ECF No. 26, ¶ 5).)

The parties dispute whether the Change Orders reflected work within the scope of the Agreement or whether they added work beyond its original scope. (ECF No. 35, ¶ 54.) BRP maintains that Change Order 1 reflected work that was already part of the parties' Agreement, but Concurrency contends that Change Order 1 included an additional $58,500 of work beyond what the original Agreement called for. (*Id.*) BRP also alleges that Change Orders 2 and 3 reflect work that was included in the original Agreement, while Concurrency maintains that they called for work beyond the scope of the original Agreement. (*Id.*, ¶¶ 55, 59.)

BRP states that it executed the Change Orders but that Concurrency never did. (ECF No. 35, ¶ 53.) Concurrency does not dispute that it did not counter-execute the Change Orders but adds that, when BRP returned them, the executed versions included redlined changes. (*Id.*) Concurrency contends that, while it did not counter-execute the Change Orders, it agreed to complete the work described in Change Order 1. (ECF No. 24 at 4 (citing ECF No. 26, ¶ 9).)

On February 3, 2020, Concurrency notified BRP that it would complete Change Order 1, at which point its obligations under the fixed-bid SOW would be complete. (ECF Nos. 35, ¶ 57; 1-4 at 2.) Concurrency also stated that Change Orders 2 and 3 were

no longer valid and that it would only complete work going forward on a time and materials basis. (*Id.*) BRP agreed to move forward on a time and materials basis for work beyond that included in Change Order 1. (ECF No. 35, ¶ 58.)

In May 2020 Concurrency terminated its relationship with BRP. (ECF No. 35, ¶¶ 60-61.) Once BRP made its final payment for services provided by Concurrency, Concurrency delivered the software to BRP in June 2020. (*Id.*, ¶ 61, 63.) Concurrency charged BRP $1,000 for a knowledge transfer session with BRP's new web developer, Centare. (*Id.*, ¶ 62.)

According to BRP, the software turned over by Concurrency was not functional. (ECF No. 35, ¶ 64.) BRP maintains that the software had the following problems:

- The code was not placed into a production environment and was not usable from an end-user perspective (ECF No. 35, ¶ 67);

- There was no user interface (*Id.*, ¶ 68);

- The three main Technology Benefits established in the Agreement, including a web application built with ability to scale, security settings providing access only to approved users, and an additional security layer to further protect the data stored by the software, were not provided (*Id.*, ¶ 69);

- The sales order management function would not work and there was no website able to be integrated with the American Kennel Club (*Id.*, ¶ 70);

- Concurrency did not develop a self-help portal (*Id.*, ¶ 71);

- Concurrency did not complete use case generation (*Id.*, ¶ 72);

- BRP could not edit its security roles or manage its user profile (*Id.*, ¶ 73);

- Concurrency did not provide a training plan, did not train BRP's representatives as end-users, or provide the final knowledge transfer until BRP paid Concurrency an additional $1,000 (*Id.*, ¶ 74);

- Error documentation, document FAQs, and document categorization/routing information were never provided to BRP (*Id.*, ¶ 75);

- Training and end-user communication did not occur because a final product was not provided (*Id.*, ¶ 76);

- Concurrency did not complete the build, and the software as-is is not deployable by BRP (*Id.*, ¶ 77);

- The product never "went live" and was never transitioned to production (*Id.*, ¶ 78);

- A production release plan and corrective course of action was not provided to BRP and a satisfactory state of usage was never achieved (*Id.*, ¶ 79);

- A formal project close meeting never occurred (*Id.*, ¶ 80);

- 34 of the 40 functional requirements never worked during testing (*Id.*, ¶ 82);

- At the present time, none of the functional requirements work outside of a testing environment (*Id.*, ¶ 82).

Concurrency states that the software it turned over to BRP met the terms of the Agreement, as amended by Change Order 1. (*See* ECF No. 35, ¶¶ 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82.) In addition, it maintains that BRP has not supported its facts with competent evidence: "Mr. Rook is not qualified to offer this opinion, and Mr. Drier was not named as an expert witness and, therefore, the cited opinion testimony is inadmissible." (*Id.*, ¶¶ 67, 68, 72, 76, 78, 83, 92.) (citation omitted).

### 2. Summary Judgment Standard

The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains

7

its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs.*, Inc., 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

### 3. Analysis

Under Wisconsin law, to establish a breach of contract the plaintiff must prove three elements: (1) a valid contract; (2) breach of that contract by the defendant; and (3) damage from the breach. *Gallo v. Mayo Clinic Health System-Franciscan Med. Ctr., Inc.*, 907 F.3d 961, 965 (7th Cir. 2018); *Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 187 N.W.2d 200, 203 (1971). Concurrency contends that expert testimony is needed to establish that it breached its contract with BRP. It argues that the issue of breach here involves unusually complex software development issues that fall outside of the factfinder's ordinary experience and common knowledge. Because BRP did not disclose any expert witnesses, Concurrency argues that it cannot establish a breach of contract.

### 3.1.     Necessity of Expert Testimony

Whether expert testimony is required to prove a given claim is a question of law. *5308 FAB Ltd. v. Team Indus. Inc.*, No. 10-CV-183, 2012 WL 1079886, at *20 (E.D. Wis. Mar. 30, 2012) (citing *Racine Cnty. v. Oracular Milwaukee, Inc.*, 2010 WI 25, ¶ 24, 323 Wis. 2d 682, 781 N.W.2d 88). "[T]he requirement of expert testimony is an 'extraordinary one,' and is to be applied by the trial court 'only when unusually complex or esoteric issues are before the jury.'" *Netzel v. State Sand & Gravel Co.*, 51 Wis. 2d 1, 186 N.W.2d 258, 262 (1971) (quoting *City of Cedarburg Light & Water Comm'n v. Allis-Chalmers Mfg. Co.*, 33 Wis. 2d 560, 148 N.W.2d 13, 16 (1967)). "In contrast, expert testimony is not necessary to assist the trier of fact concerning matters of common knowledge or those within the realm of ordinary experience." *Oracular*, 2010 WI 25, ¶ 28, 23 Wis. 2d 682, 781 N.W.2d 88 (citing *Netzel*, 51 Wis. 2d 1, 186 N.W.2d at 261; *Cramer v. Theda Clark Mem'l Hosp.*, 45 Wis. 2d 147, 172 N.W.2d 427, 428-29 (1969)). Where the jury can draw its own conclusions without the assistance of expert testimony, "the admission of such testimony is not only unnecessary but improper." *Id.* (quoting *Cramer*, 45 Wis. 2d 147, 172 N.W.2d at 429).

Concurrency argues that expert testimony is needed to assist the trier of fact in evaluating BRP's breach of contract claim because it involves software development issues that are unusually complex or esoteric—that is, issues that are "so complex or technical that a jury would be speculating without the assistance of expert testimony." (ECF No. 24 at 8 (quoting *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 541 N.W.2d

753, 758 (1995)).) "A cursory review of the Agreement itself shows clearly that the subject matter falls outside of the ordinary experience and common knowledge of a layperson." (ECF No. 24 at 8.) For instance, Concurrency states that a jury would need to determine whether the software met the project outcomes established in the Agreement: 1) a responsive web application deployed and running in Microsoft Azure Cloud environment; 2) a responsive web application layout with style and branding elements created by Concurrency; 3) a web application with API architecture to support external plug-ins; 4) secured web application with BRP internal user roles such as breeder, distributor, broker, transporter, retail (dot com and brick & mortar) and veterinarian. (*Id.*)

That the Agreement includes technical language that a layperson may not be able to grasp does not automatically render BRP's breach of contract claim so complex or esoteric that an expert is needed. It is undisputed that the parties entered into the Agreement for the purpose of having Concurrency build a web application that would allow BRP to sell and distribute pets. BRP claims that Concurrency breached the Agreement by turning over a piece of software that did not work.

Whether BRP needs expert testimony to support its claim depends not on the complexity of the subject matter of the Agreement but on whether the specific breaches alleged by BRP are so complex that a factfinder could not properly evaluate BRP's claim without the assistance of an expert. Both parties cite *Racine County v. Oracular*, 2010 WI

25, 23 Wis. 2d 682, 781 N.W.2d 88, in support of their respective positions. In that case, Racine County contracted with Oracular, a computer consulting company, to upgrade and install new human resources, payroll, and financial software. 2010 WI 25, ¶ 6, 23 Wis. 2d 682, 781 N.W.2d 88. The issue before the court was "whether in order to survive summary judgment, Racine County was required to name an expert witness when the complaint alleged that Oracular breached the parties' Consulting Service Agreement by failing to institute the software as promised." *Id.*, ¶ 4.

The court held that Racine County was not required to rely on expert testimony to survive summary judgment. *Oracular*, 2010 WI 25, ¶ 29, 23 Wis. 2d 682, 781 N.W.2d 88. The court found that the breaches alleged by Racine County—that Oracular failed to complete the project on time and failed to provide competent training—concerned "matters of common knowledge and [were] within the realm of ordinary experience." *Id.*

The court noted that, with respect to its allegation that Oracular failed to complete the project on time, Racine County intended to produce evidence that the agreement expressly stated that the project was to be completed by a certain date, concluding that the factfinder would be able to determine whether the project was completed by that date. *Oracular*, 2010 WI 25, ¶ 31, 23 Wis. 2d 682, 781 N.W.2d 88. The court stated that "whether the software installation project was completed by a specified date is distinct from the complexity of the work that goes into the

installation—complexity that Racine County concedes. The former is not so 'unusually complex or esoteric' … as to require the assistance of expert testimony." *Id.* (citation omitted).

With respect to its allegation that Oracular failed to provide competent training, Racine County planned to introduce testimony from its employees that Oracular's own training consultant was unfamiliar with the software, and that its project manager admitted the project was "staffed for failure." 2010 WI 25, ¶ 32, 23 Wis. 2d 682, 781 N.W.2d 88. The court explained that "the fact-finder is capable of drawing upon common knowledge and ordinary experience to determine whether Oracular provided competent training." *Id.*

According to Concurrency, the court's statement in *Oracular* that "[t]he question of whether the software installation project was completed by a specified date is distinct from the complexity of the work that goes into the installation" recognizes that, in some breach of contract cases involving software services agreements, expert testimony is required. (ECF No. 24 at 13.) It further contends that, while Racine County's allegations were not considered so unusual or esoteric as to require the assistance of expert testimony, BRP's claim involves matters that fall outside the ordinary experience and common knowledge of the factfinder. (*Id.* at 13-14.) Specifically, Concurrency argues that to prove its breach of contract claim, BRP must show: 1) that Concurrency breached the standard of care the parties contracted for; and 2) that Concurrency failed to provide

the product, features, and services in accordance with the Agreement's specifications, and failed to provide a functional product. (ECF No. 24 at 11, 13.)

As to the issue of whether Concurrency breached the standard of care the parties contracted for, Concurrency maintains that, pursuant to the Agreement, it agreed to "design, develop, and deploy an application for Blue Ribbon Puppy that implements cloud development best practices and leverages resources and services in the Microsoft Azure Platform" with "high standards and best practice methodologies and tooling." (ECF No. 24 at 11 (citing ECF No. 27, ¶¶ 9-10).) It argues that the issue of whether it met these standards requires the assistance of expert testimony. (ECF No. 24 at 12.) In support of its argument, Concurrency points to *K&D Distributors Ltd. v. Aston Group (Michigan), Inc.*, 354 F. Supp. 2d 761, 763 (N.D. Ohio 2005), in which a customer contracted with a software development company to provide customized business software. The customer began experiencing problems with the software and brought suit against the software company, alleging that it failed to perform all work in a professional manner and delivered a system that failed to perform as promised. *Id.* at 763-64. On summary judgment the court held that expert testimony was required to determine whether the software company performed all work in a professional manner because it was a question requiring scientific, technical, and specialized knowledge. *Id.* at 765-66.

As to whether Concurrency failed to provide the product, features, and services in accordance with the Agreement's specifications, and failed to provide a functional product, Concurrency again points to the various technical provisions of the Agreement in arguing that expert testimony is required to assist the jury in evaluating whether those provisions were breached. (ECF No. 24 at 14 (citing ECF No. 30, ¶¶ 22, 37).)

But Concurrency misstates the breaches alleged by BRP. While in *K&D Distributors*, the plaintiff alleged that the defendant software company failed to perform all work in a professional manner, BRP does not allege as part of its claim that Concurrency breached the Agreement by failing to meet the standard of care the parties contracted for. 354 F. Supp. 2d 761, 76; *see also Oracular*, 2010 WI 25, ¶ 29, 23 Wis. 2d 682, 781 N.W.2d 88 ("There is no allegation that Oracular's performance failed to meet the standards of the computer consulting industry.... Accordingly, the issue is not whether Racine County is required to present expert testimony in order to demonstrate that Oracular's performance fell below the industry standard of care."). Nor does BRP allege that Concurrency failed to fulfill each technical provision of the Agreement.

According to BRP, its breach of contract claim can be narrowed to three issues: 1) whether Concurrency built a functioning website that allowed BRP to distribute pets; 2) whether the website was placed into production, was "live," and able to be used by BRP and its customers; and 3) whether Concurrency provided training on the use of the web application as required by the Agreement. (ECF No. 31 at 13.) BRP maintains that none

14

of these issues is so complex or esoteric that an expert testimony is needed to assist the trier of fact; rather, they are "reasonably comprehensible issues for a jury." (*Id.* at 13-14.)

The court agrees with BRP that expert testimony is not required for it to sustain its breach of contract claim. The Agreement provided that Concurrency would build a web application allowing BRP to sell and distribute pets. BRP claims that Concurrency breached the Agreement by failing to provide a functioning website that allowed it to distribute pets; failing to provide knowledge transfer and training to BRP; and failing to place the software into production or make it "go live." The issues of whether Concurrency provided knowledge transfer and training to BRP, and whether the software Concurrency developed was ever placed into production or "went live," are similar to the allegations involved in *Oracular*. These issues are not incredibly complex or esoteric—a factfinder is able to assess them without the assistance of an expert.

Additionally, the issue of whether Concurrency provided BRP functioning website software falls within the ordinary experience and common knowledge of the factfinder. Whether the software was functional is distinct from the complexity of the work that goes into developing that software. *See Oracular*, 2010 WI 25, ¶ 31, 23 Wis. 2d 682, 781 N.W.2d 88. While expert testimony could assist the factfinder in assessing BRP's claim, it is not needed as a matter of law for BRP to sustain its breach of contract claim as alleged. *See id.*, ¶ 35 ("[W]e do not close the door to the possibility that expert testimony may later assist the trier of fact in evaluating the breach of contract claim.

Rather, we decide that based upon the pleadings and affidavits, Racine County was not required to name an expert witness in order to proceed.")

### 3.2. Sufficiency of BRP's Evidence

Concurrency objects to much of the evidence that BRP relies upon in support of its breach of contract claim. It argues that the testimony BRP offers from Rook, Drier, and Czarnecky constitutes expert testimony that BRP cannot offer because it failed to disclose any expert witnesses (and it argues that Rook is unqualified to offer such opinions).

BRP responds that it can fully present its claim to the jury by relying on lay testimony from the BRP project team.[1] (ECF No. 31 at 16.) According to BRP, Rook, Drier, and Czarnecky each have personal knowledge of whether the software turned over by Concurrency was functional:

> They all have personal knowledge of whether the web application is able to function as was promised in the Agreement. They will be able to describe to the jury what, from a user experience, the web application was like to a user, what it looked like, if they were able to edit their profiles. Finally, in particular, Mr. Rook will be able to describe to the jury whether the web application he received was functional.

(ECF No. 31 at 16.) BRP maintains that these witnesses can testify to these matters under Rule 602 of the Federal Rules of Evidence because they participated in the sprint review

---

[1] BRP maintains that it can support its claim with testimony from Rook, Drier, Czarnecky, "and/or" a representative from Centare. The parties do not point to specific testimony from Czarnecky that they assert is or is not admissible, so the court does not explicitly rule on the admissibility of his testimony. Concurrency also points out that BRP did not disclose a witness from Centare in its Rule 26(a) disclosures. (ECF No. 34 at 12.) Assuming that is the case, BRP would be barred under Rule 37(c) from offering testimony from a Centare representative. *See* Fed. R. Civ. P. 37(c).

sessions and "actually viewed, tested, and/or used the software in the state it was turned over by Concurrency." (*Id.* at 14-15.)

Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Additionally, Rule 701 allows lay witnesses to offer opinions if they are "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Fed. R. Evid. 701. "Lay opinion testimony is admissible only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002). On the other hand, opinion testimony crosses the line from lay to expert opinion when it "brings to an appraisal of those facts a scientific, technological or other specialized knowledge that the lay person cannot be expected to possess." *Id.*

### 3.2.1. Drier

Concurrency maintains that the testimony Drier will offer constitutes expert opinion testimony and that, because Concurrency failed to disclose any expert witnesses, his testimony is inadmissible. (*See* ECF No. 35, ¶¶ 33, 45, 46, 47, 67, 68, 69, 70, 72, 73, 76, 78, 79, 81, 82, 92.) It points out that Drier's declaration sounds like a typical

expert witness report: "first, Mr. Drier makes clear that he has specialized knowledge with over 32 years of experience in the field of IT infrastructure, project management, and software development. Precisely because of that specialized knowledge and experience, Mr. Drier purports to evaluate the product Concurrency delivered." (ECF No. 34 at 7-8.)

While aspects of Drier's declaration reflect his observations from viewing and testing the software, much of it "brings to an appraisal of those facts" technological or specialized knowledge that a lay person would not be expected to possess. *See Conn*, 297 F.3d at 554. For example, when declaring that the software did not have a user interface, Drier states, "[i]n my personal experience, a defined user interface, or how a user will experience and interact with the software, is one of the first things developed in a project such as this in conjunction with developing specific features." (ECF No. 30-1, ¶ 5.) Drier also states that "Concurrency attempted to develop each of BRP's requested features and underlying data elements in isolation, which meant that the scoped features were never connected to function together." (*Id.*, ¶ 6.) He further explains that none of the three main Technology Benefits were conferred to BRP, including "a web application built with ability to scale, a B2C security layer to provide secured access to only approved users, and a 'lease time' security layer." (*Id.*, ¶ 9.)

These portions of Drier's declaration cannot be classified as lay opinion; rather, they cross the line into expert opinion. They provide specialized explanations or

interpretations that a layman could not make if perceiving the software. As Concurrency points out, Rook himself admitted that Drier had a technical expertise "that would allow Mr. Drier to testify about certain aspects of the software that Mr. Rook could not." (ECF No. 24 at 9-10.) It is these opinions—assessments that Drier can make only because of his expertise in the software industry—that cross that threshold. Such testimony is inadmissible because Concurrency failed to disclose Drier as an expert witness.

That said, other portions of Drier's testimony are based on his own observations while viewing and testing the software and do not provide specialized explanations and interpretations regarding those observations. For example, Drier stated in his declaration that "there was no functionality that allowed a user to move through the relationships between specific entities in the software." (ECF No. 30-1, ¶ 7.) He explained that a user could search for and view a puppy or litter, but there was no link between individual puppies and the litter each puppy came from or their parents. (*Id.*) This testimony is based on Drier's personal knowledge of the software's capabilities. Moreover, Drier states in his declaration that the 40 functional requirements provided for in the Agreement—the functions that the final software was supposed to be capable of (e.g., uploading and saving documents, editing account information, creating and editing information on litters)—were never completed. (*Id.*, ¶¶ 11-12.) Testimony from Drier regarding what he observed while viewing or using the software, absent opinions

or assessments as to why the software functioned how it did, is admissible under Rule 602. *See United States v. Christian*, 673 F.3d 702, 708-09 (7th Cir. 2012) ("A witness can qualify as both a fact and expert witness and an expert may base an opinion on fact or data in the case that the expert has personally observed. Thus, the Rules do 'not distinguish between expert and lay witnesses, but rather between expert and lay testimony.'") (citations omitted).

### 3.2.2. Rook

Concurrency objects to much of Rook's testimony on the basis that it constitutes expert opinion that he is not qualified to provide. (*See* ECF No. 35, ¶¶ 33, 43, 45, 64, 65, 66, 67, 68, 71, 72, 76, 77, 78, 83, 84, 89, 90, 92.) As noted above, Concurrency points out that Rook stated in his deposition that he could not speak to specific technical shortcomings of the software. (ECF No. 24 at 9-10.) But that does not render all of Rook's testimony inadmissible.

Indeed, much of the testimony BRP plans to offer through Rook is based on his personal observations from viewing and testing the software. Like Drier, Rook can testify to matters of personal knowledge regarding the software's capabilities under Rule 602. For example, in his declaration Rook states that he was familiar with BRP's old software, DOW, its functionalities, and how Concurrency's software was intended to upgrade and replace those functionalities. (ECF No. 30-2, ¶¶ 5, 6, 8, 10.) Rook also participated in many of the sprint reviews and was able to observe the functionality of

the software Concurrency built and eventually gave to BRP. (*Id.*, ¶¶ 9, 10, 11.) For instance, Rook states that he observed that only six of the 40 functional requirements actually functioned during testing, that none worked outside of testing, and that he was not able to use the software outside of a testing environment. (*Id.*, ¶ 12.)

Whether the software Concurrency provided met the functional requirements does not require technical or specialized knowledge. Indeed, it is undisputed that Rook helped plan these functional requirements. (ECF No. 35, ¶ 5.) Again, Rook acknowledges that he is "not a software development expert" and that he "cannot speak to the specifics on the code behind the each of these Functional Requirements." (*Id.*, ¶ 13.) Nevertheless, he is able to testify as to whether the software turned over by Concurrency was able to do what it was supposed to do.

Contrary to BRP's assertions, BRP has produced competent evidence to support its claim that Concurrency breached the Agreement by failing to provide a functional web application. While certain aspects of the testimony BRP intends to rely upon may be inadmissible, much of it is based on the witnesses' own personal knowledge and is admissible under Rule 602. The court finds that BRP has pointed to sufficient evidence to sustain its breach of contract claim against Concurrency.

Moreover, the court finds that BRP's claim presents genuine issues of fact that preclude summary judgment. Accordingly, summary judgment is not appropriate at this stage of the proceedings.

### 4. Conclusion

For the reasons stated above, the court finds that BRP is not required to provide expert testimony to support its breach of contract claim as a matter of law. Additionally, while certain portions of the testimony BRP relies on as evidence supporting its claim cross the threshold from lay testimony based off the witnesses' personal observations to expert opinion testimony based on specialized and technical knowledge and experience, much of the testimony BRP offers is admissible under Rule 602. In sum, BRP has produced sufficient evidence to sustain its breach of contract claim. Accordingly, Concurrency's motion for summary judgment will be denied.

**IT IS THEREFORE ORDERED** that Concurrency's motion for summary judgment (ECF No. [23]) is **DENIED**.

Dated at Milwaukee, Wisconsin this 8th day of May, 2024.

WILLIAM E. DUFFIN
U.S. Magistrate Judge